**F I L E D**

PUBLISH

**APR 27 2004**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DAVID WIRANSANE,

Petitioner,

v.

JOHN ASHCROFT, Attorney General
of the United States,

Respondent,

AMERICAN IMMIGRATION LAW
FOUNDATION,

Amicus Curiae.

No. 02-9555

**PETITION FOR REVIEW OF A DECISION OF THE
BOARD OF IMMIGRATION APPEALS
(BIA NO. A76-386-237)**

Carol B. Lehman, Lakewood, Colorado, for Petitioner.

Donald E. Keener, Office of Immigration Litigation, Civil Division, United States
Department of Justice, Washington, D.C., appeared by telephone conference
(Emily Anne Radford, Assistant Director, and Allen W. Hausman, Senior
Litigation Counsel, on the brief), for Respondent.

Mary A. Kenney, Nadine K. Wettstein, and Beth Werlin, American Immigration
Law Foundation, Washington, D.C., on the brief as Amicus Curiae for Petitioner.

Before **EBEL**, **ANDERSON**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Petitioner David Johanes Wiransane appeals a decision by an immigration judge (IJ), affirmed by the Board of Immigration Appeals (BIA), denying his claims of eligibility for asylum and for restriction on removal under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101, *et seq*. A native and citizen of Indonesia, Petitioner claims that he fears persecution in Indonesia because of anti-Chinese riots that erupted in that country after his arrival in the United States.

At a hearing on November 17, 1998, the IJ denied Petitioner's claim. The BIA affirmed the IJ's decision without opinion on July 23, 2002. Petitioner appeals. Exercising jurisdiction under 8 U.S.C. §1252(a), *see Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1235 (10th Cir. 2003), we reverse and remand for further proceedings. The IJ failed to explain adequately why he discredited Petitioner's testimony that he was of Chinese ethnicity, improperly required that Petitioner's original motive for coming to the United States be a fear of persecution, and failed to consider whether events in Indonesia could support a well-founded fear of persecution or a finding of a clear probability of persecution.

## I. BACKGROUND

### A. Asylum and Withholding Law

An alien who fears persecution if returned to a particular country has two possible means of relief under the INA: asylum and restriction on removal.[1] *Tsevegmid*, 336 F.3d at 1234. A grant of asylum permits the alien to remain in this country; a restriction on removal forbids removal of the alien to the country where persecution may occur. *See* INA §§ 208 & 241(b)(3), codified at 8 U.S.C. §§ 1158 & 1231(b)(3); *see also Tsevegmid*, 336 F.3d at 1234. Asylum is within the discretion of the Attorney General, while restriction on removal is granted to qualified aliens as a matter of right. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987).

#### 1. Asylum

Under § 208(b)(1) of the INA, 8 U.S.C. § 1158(b)(1), to be eligible for a discretionary grant of asylum by the Attorney General, an alien must first establish status as a refugee. *See Krastev v. INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). The INA defines a refugee as "any person . . . outside [his] country of . . .

---

[1]Restriction on removal was referred to as "withholding of removal" before amendments to the INA made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009. Although both parties and the IJ refer to withholding of removal, for the sake of accuracy, and because this claim was filed after IIRIRA's effective date, we will use the term "restriction on removal" throughout this opinion.

nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

An applicant can establish status as a refugee by showing he either (1) "has a well-founded fear of future persecution," *Krastev*, 292 F.3d at 1270 (internal quotation marks and brackets omitted), (2) "has suffered past persecution, which gives rise to a [rebuttable] presumption [of] . . . a well-founded fear of future persecution," *id.* at 1270–71, or (3) has suffered "past persecution so severe as to demonstrate compelling reasons for being unwilling or unable to return" to his country of nationality, *id.*, at 1271 (internal quotation marks omitted). Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and "an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear [of] . . . persecution." *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (internal quotation marks omitted).

Although persecution is not defined in the INA, we have held that a finding of persecution "requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive" and must

entail "more than just restrictions or threats to life and liberty." *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir. 2001) (internal quotation marks omitted). Such persecution may be inflicted by the government itself, or by a non-governmental group that "the government is unwilling or unable to control." *Batalova v. Ashcroft*, 355 F.3d 1246, 1253 (10th Cir. 2004) (internal quotation marks omitted).

It is not necessary for an asylum applicant to show that he has been or may be singled out for persecution to establish that he has an objectively well-founded fear of persecution; he may do so by demonstrating his membership in a group determined by "race, religion, nationality . . . or political opinion" or "a particular social group" subject to "a pattern or practice of persecution." 8 C.F.R. § 208.13(b)(2)(iii)(A); *see also Woldemeskel*, 257 F.3d at 1190. In other words, "an applicant is permitted to show that a person in his position, as opposed to himself specifically, could be subject to persecution." Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 53 Fed. Reg. 11,300 (Apr. 6, 1988).

### 2. Restriction on Removal

Applications for restriction on removal are governed by INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), which requires an applicant to show that his "life or freedom would be threatened in [his home] country because of

[his] race, religion, nationality, membership in a particular social group, or political opinion." The Attorney General may not remove an alien if the alien is able to establish "a clear probability of persecution" in the country to which he would be returned. *Tsevegmid*, 336 F.3d at 1234. The standard of proof for restriction on removal is "more demanding than the well-founded fear standard applicable to an asylum claim." *Id.* (internal quotation marks omitted). Thus, when an applicant fails to establish the objective component of a well-founded fear of persecution, he necessarily fails to establish entitlement to restriction on removal. *See Batalova,* 355 F.3d at 1255; *Yuk,* 355 F.3d at 1236 (IJ correctly denied restriction on removal when "petitioners failed to meet the lower standard of showing entitlement to asylum").

## C. Factual Background

### 1. Petitioner's Background

Through his hearing testimony on November 17, 1998, and personal documents he submitted to the IJ, Petitioner gave the following account of his life before entering the United States: Petitioner was born in Bandung, Indonesia, in 1978, to Chinese parents. His father's surname, as it appeared on Petitioner's birth certificate, was Chinese, though his mother's was not—possibly due to a legal requirement that ethnic Chinese adopt Indonesian names. *See* Human Rights Watch, *The Damaging Debate on Rapes of Ethnic Chinese Women* (1998), R. at

314 ("More than twenty discriminatory laws and regulations are still in force[,] . . . includ[ing] . . . a regulation obliging all ethnic Chinese to take 'Indonesian' names."). Petitioner testified that his mother was Chinese and had an alternate Chinese name.

During his early childhood Petitioner lived with his mother in her parents' home and attended a Chinese-Christian school. At the age of seven, he moved with his mother and her second husband, an American, to Japan. After this marriage failed, Petitioner returned with his mother to Indonesia where they again lived with his grandparents. When he was 13 or 14 years old, armed men broke into his grandparents' house and forcibly kicked out Petitioner and his mother, after which they were essentially homeless for a year, living alternately in his mother's car and in the homes of various friends. Petitioner believed that during this ordeal the police were looking for his mother and him, and trying to force him to sign away his inheritance from his maternal grandparents. He then moved with his mother to Holland, where, after an unsuccessful attempt at gaining asylum that necessitated a side trip to Singapore, they settled for approximately four years. His mother grew increasingly abusive, so he came to the United States in September 1997 to get away from her.

## 2. Asylum Proceedings

Petitioner was taken into custody by the Immigration and Naturalization Service (INS) on February 5, 1998, for entering the United States on a false Belgian passport. He has not challenged his deportability, but has sought asylum and restriction on removal. He also has not claimed past persecution, although his Application for Asylum contains a few sentences describing the bizarre circumstances surrounding the eviction of his mother and him from their home in Indonesia, and he briefly testified about the matter at the hearing. Rather, he asserts a well-founded fear of future persecution and a clear probability of persecution based on "country-wide" anti-Chinese persecution in Indonesia.

Petitioner submitted in support of his testimony copies of his passport(s), a letter verifying the contents of his birth certificate, school forms, and other documentary information pertaining to his personal history. He also submitted (1) a United States State Department Country Report on Indonesia for 1997, (2) several Human Rights Watch reports on Indonesia, (3) dozens of newspaper and other news media reports detailing attacks on ethnic Chinese in Indonesia leading up to major riots in May 1998 and continuing past that date, and (4) Congressional denunciation of the riots.

In his oral decision of November 17, 1998, the IJ ruled that Petitioner was not a refugee within the meaning of INA § 208(a) because he failed to show a

"well-founded fear of persecution." The IJ acknowledged that Petitioner had submitted an official country report and "articles regarding the situation in Indonesia," Oral Decision at 2, but did not discuss their contents or refer to them in his analysis. He described Petitioner's fears as follows:

> He indicates that he believes that if, in fact, he returned to Indonesia, that he would be wanted by the police; that he is afraid to go back to Indonesia because they discriminate a lot against ethnic Chinese; that he believes people are looking for him because of his inheritance; that he believes if returned to Indonesia, he would be killed or hurt by these particular individuals.

*Id.* at 7. He then found that "[Petitioner's] testimony was not sufficiently detailed, consistent, or believable to provide a plausible and coherent account of the basis for his fears; and thus, cannot suffice to establish his eligibility for asylum without further corroborating evidence." *Id.* at 9. The IJ's focus on Petitioner's testimony indicates that the IJ was considering only the testimony by Petitioner relating to his particular circumstances—the eviction from his home and the pecuniary motives for further violence against him.

Further indicating that the IJ's focus was on Petitioner's particular situation, rather than general ethnic violence, were two later comments in the IJ's oral opinion. First, the IJ recited the proposition that:

> an alien [must] do more than show a threat of persecution in a particular place or abode within the country. Rather, he must show that the threat of persecution for him or her exists countrywide. Again, the [Petitioner] has failed to do that today. There has been no

evidence [that] if he would relocate in Indonesia, that he would have problems with the police or whatever.

*Id.* at 10. This observation would not be applicable to the general anti-Chinese violence, which apparently was countrywide.

Second, the IJ's concluding remarks emphasize Petitioner's personal situation:

> [A]gain, he is telling me that people are out to kill him, that the police are out to kill him. I really think there has to be some type of evidence showing this particular matter. There has been none whatsoever. I cannot imagine why the Indonesian police or anybody in Indonesia would be after this particular gentleman, who is 20 years of age—He has not been there for approximately six years now, since he has been in Holland for four, and the United States for approximately two—that anybody would be after him for any reason whatsoever.

*Id.* at 11. The IJ's only possible reference in his ruling to general anti-Chinese violence in Indonesia was a comment on the apparent safety of Petitioner's family in Indonesia. Quoting from a headnote in *In re A– E– M–*, 21 I & N Dec. 1157 (BIA 1998), the proposition that "[t]he reasonableness of an alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure," the IJ said :

> He indicates that he has an uncle, an aunt, two cousins that still remain in Indonesia. Again, if they were, in fact, ethnic Chinese, and it was as bad as [Petitioner's lawyer] indicates, they would probably be gone from there. And, again, the Court feels that those people have been there for quite some time and still remain there, as far as the Court knows, as far as the evidence that was shown today.

-10-

*Id.* at 12.

Perhaps the IJ's failure to address the anti-Chinese violence in Indonesia was the result of the IJ's discrediting Petitioner's claims that he is Chinese. The IJ said:

> The Court would indicate that one of the things that [Petitioner] must prove to the Court is that, in fact, he is in fact an ethnic Chinese. The Court would indicate that from prior hearings that the Court has, in fact, had regarding Indonesians, that the Court cannot tell whether this gentleman is, in fact, ethnic Chinese or if he is not Indonesian. The Court is not able to tell, and the Court would indicate that there is not sufficient proof to show that in fact this gentleman is, in fact, ethnic Chinese; that we have not received any evidence whatsoever, other than his testimony that he is, in fact, of this particular race. The Court is not satisfied with the evidence that was presented regarding that particular matter.

*Id.* at 9.

As a third ground for decision, the IJ found that Petitioner did not come to this country because of a fear of persecution:

> The Court would also indicate that the [Petitioner] was, in fact, living in Holland. . . . Yet, if he had fear of being persecuted in Indonesia, he never applied for asylum there. He had all the opportunity in the world to apply for asylum in that particular country and never did so. He specifically stated that he came to the United States, not because he feared persecution but because he feared his mother. . . . There is no doubt whatsoever in my mind that that is true, but that is not sufficient to grant asylum in this particular matter.

*Id.* at 9–10.

Having found that Petitioner was ineligible for asylum, the IJ also ruled that Petitioner had failed to satisfy the clear-probability-of-persecution standard for restriction on removal. The IJ therefore denied Petitioner's asylum and restriction-on-removal claims, but granted voluntary departure for December 17, 1998, *see* 8 U.S.C. § 1229c (providing for voluntary departure).

Petitioner timely appealed to the BIA, which affirmed the IJ's decision without opinion under 8 C.F.R. § 1003.1(a)(7) on July 23, 2002. Petitioner appeals, arguing that (1) the BIA's affirmance without opinion violated due process, (2) the IJ improperly rejected Petitioner's claims deriving from alleged anti-Chinese persecution in Indonesia, and (3) the IJ erred in failing to consider the objective element of Petitioner's asylum claim from Petitioner's exact perspective.

## II. DISCUSSION

### A. Due-Process Claim

Petitioner argues first that the BIA's use of an affirmance without opinion violated constitutional guarantees of procedural due process. We need not discuss this argument, which we rejected in *Yuk*, 355 F.3d 1222, 1232 (10th Cir. 2004).

### B. Claims Based on Anti-Chinese Persecution

Petitioner's claims for asylum and restriction on removal are based on the threat of anti-Chinese persecution in Indonesia. The IJ rejected both claims on the

ground that Petitioner had not established his Chinese ethnicity. The IJ also apparently rejected Petitioner's asylum claim on the ground that Petitioner did not come to this country because of a fear of persecution. The IJ did not address whether the events in Indonesia would either support a well-founded fear of persecution by someone of Chinese ethnicity or establish a clear probability of persecution of such a person. As we now proceed to discuss, we hold that the IJ (1) did not adequately explain his rejection of Petitioner's claim to be Chinese and (2) incorrectly assumed that eligibility for asylum requires that the applicant have come to the United States out of fear of persecution. We therefore reverse the IJ's ruling and remand for further proceedings. At the proceedings it may be necessary to address the threat of persecution in Indonesia to persons of Chinese ethnicity.

## 1. Standard of Review

"Where . . . the BIA summarily affirms or adopts an immigration judge's decision, this court reviews the judge's analysis as if it were the BIA's." *Tsevegmid*, 336 F.3d at 1235. Our standard of review is highly deferential: "We review the IJ's resolution of the initial refugee status question under a substantial evidence standard." *Yuk*, 355 F.3d at 1233. In other words, the IJ's adverse asylum decision "must be upheld if supported by reasonable, substantial and probative evidence on the record as a whole." *Krastev*, 292 F.3d at 1275.

Application of this standard to credibility findings takes on a special importance in asylum cases because of the inherent difficulties a purported refugee may have in obtaining documentation to back up his claims. *See*, *e.g.*, *Senathirajah v. INS*, 157 F.3d 210, 215–16 (3d Cir. 1998). In recognition of the problem, the regulations governing the establishment of asylum eligibility provide that an applicant's testimony, "if credible . . . may be sufficient to sustain the [applicant's] burden of proof without corroboration." 8 C.F.R. § 208.13(a); *see* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 53 Fed. Reg. 11,300 (Apr. 6, 1988) (noting that this rule, originally proposed as 8 C.F.R. § 208.12(a), 52 Fed. Reg. 32, 552 (Aug. 28, 1987), "was drafted to recognize that the flight or defection of a bona fide refugee from a country that engages in widespread persecution may leave him in a difficult position to corroborate his claim.").

Accordingly, we have joined several other circuits in requiring that an IJ generally must give "specific, cogent" reasons for an adverse credibility finding. *See Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004); *El Moraghy v. Ashcroft*, 331 F.3d 195, 205 (1st Cir. 2003); *Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003); *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003); *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989); *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004); *Nyama v. Ashcroft*, 357 F.3d 812, 817 (8th Cir. 2004); *He v. Ashcroft*,

328 F.3d 593, 595 (9th Cir. 2003). "Adverse credibility determinations based on speculation or conjecture . . . are reversible." *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir. 2002). We will reject an adverse credibility finding for which an IJ gives virtually no reasoning. *See Figeroa*, 886 F.2d at 79 ("the BIA offered no reason whatsoever for disbelieving [petitioner]"). Even when an IJ might have had a reason based on the record for rejecting testimony, it is insufficient if he does not present that reason in his decision. *See, e.g., El Moraghy*, 331 F.3d at 205 ("It may be that the IJ believed [petitioner] not to be credible, which was the conclusion of the initial interviewing officer. If so, the IJ neither made such a finding, nor explained the basis in evidence for such a finding, both of which are basic errors.").

## 2. Credibility of Petitioner's Testimony Regarding Ethnicity

As recounted above, the IJ did not credit Petitioner's claim that he was ethnically Chinese, saying: "[W]e have not received any evidence whatsoever, other than his testimony that he is, in fact, of this particular race. The Court is not satisfied with the evidence that was presented regarding that particular matter." Oral Decision at 9. We hold that the IJ failed to state a substantial basis for rejecting Petitioner's claim that he is ethnically Chinese. The IJ did not provide any reasoning for finding Petitioner's testimony, on its own, insufficient to establish his ethnicity. Corroborating documentary evidence is not required. *See*

-15-

*Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004) (noting that under 8 C.F.R. § 208.13, "[f]ailure to tender a birth certificate to prove that one was a Russian Jew would . . . not be decisive evidence that one was not Jewish"); *In re S–M–J–*, 21 I. & N. Dec. 722 at *9. We remand for a redetermination of Petitioner's claim that he is ethnically Chinese.

Because the IJ found that Petitioner had not established his Chinese ethnicity, the IJ did not proceed to examine the evidence that persons of Chinese ethnicity face persecution in Indonesia. Nor did the government address the matter in its brief to this court. (Although the IJ mentioned that any claim of a threat to Petitioner on the basis of his ethnicity was undercut by the fact that he still had family living in Indonesia, there is no evidence of this in the record. All that is known of Petitioner's family in Indonesia is his testimony that the only relatives he might still have there are his uncle's family, with whom he does not "have any contact . . . at all." R. at 110.) If on remand Petitioner is found to be ethnically Chinese, it will then be necessary to make the findings regarding persecution that are required to resolve Petitioner's claims for asylum and restriction on removal. We note that because more than five years have passed since Petitioner's original asylum hearing, current conditions in Indonesia may be taken into account in resolving this issue. *See INS v. Ventura*, 537 U.S. 12, 17–18 (2002) (ordering remand of asylum case to BIA for consideration of changed country conditions);

*Secaida-Rosales v. INS*, 331 F.3d 297, 313 (2d Cir. 2003) (after concluding that IJ had made a baseless credibility determination at asylum hearing, remanding the case "to allow the IJ to reach the secondary question of country conditions" in light of evidence on current country conditions). Subsequent events in Indonesia may well undercut Petitioner's claims. *See, e.g., Limerta v. Ashcroft,* No. 02-9576, 88 Fed. Appx. 363, 366 (10th Cir. 2004); *Lauw v. Ashcroft*, No. 02-4225, 2003 U.S. LEXIS App. 22742 at *5 (3d Cir. Nov. 4, 2003).

### 2. Subjective Fear of Persecution

As an alternative ground for rejecting Petitioner's asylum claim, the IJ apparently found that Petitioner lacked a subjective fear of persecution. (There is no requirement of a subjective fear for a restriction-on-removal claim, but the objective standard for restriction on removal—a clear probability of persecution—is more stringent than the objective standard for refugee standing for purposes of asylum—that the fear of persecution be well-founded.)

The IJ found that Petitioner came to the United States to escape his mother, not out of fear of persecution in Indonesia. This finding is undisputed. But it is legally irrelevant.

An applicant need not have fled his home country out of fear of persecution to qualify as a refugee. INA § 101(a)(42)(A) simply defines the term "refugee" as "any person who is *outside* any country of such person's nationality or . . . any

country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country" for statutorily protected reasons. 8 U.S.C. § 1101(a)(42)(A) (emphasis added). The definition omits any reference to or requirement of flight, and thereby renders irrelevant why the applicant left his country of origin. *See* Thomas Alexander Aleinikoff, David A. Martin & Hiroshi Motomura, Immigration and Citizenship: Process and Policy 1109 (4th ed. 1998) ("The current statutory definition of 'refugee' (in INA § 101(a)(42)(A)), like the UN definition from which it is derived, contains no . . . requirement" that "beneficiaries . . . show that they 'fled' because of a fear of persecution.").

Indeed, the federal courts—including this circuit—often address (and grant) refugee claims based on fear of persecution that arise only once petitioners are in the United States. *See, e.g., Yuk*, 355 F.3d at 1225 (considering asylum claim based on coup in Cambodia after petitioner's departure for vacation in the United States); *Motamedi v. INS*, 713 F.2d 575 (10th Cir. 1983) (remanding asylum claim to BIA for consideration of new evidence; Iranian petitioner came to United States as student prior to Iranian Revolution, and based claims of fear on anti-Khomeini demonstrations in which he participated while in the United States); *Chang v. INS*, 119 F.3d 1055, 1068 (3d. Cir. 1997) (granting refugee status to and vacating denial of withholding of removal from head of Chinese technical

delegation who sought asylum for failing to report intended defection of members of delegation who announced that intention only after arrival in the United States); *see generally* Deborah E. Anker, Law of Asylum in the United States 35 (3d. ed. 1999) ("The Board and the courts have considered various claims to protection based on events that occur after the applicant's departure from her country.").

Here, neither the IJ nor the government has suggested that Petitioner now lacks a subjective fear of persecution in Indonesia based on his ethnicity. Thus, we remand for a finding on that matter.

## C. Reasonable-Person Standard

Petitioner's final argument is that the IJ erred in failing to consider whether a reasonable person in Petitioner's exact position would have had a well-founded fear of persecution upon return to Indonesia. Petitioner argues that in determining whether he had an objective fear of persecution upon returning to Indonesia, the IJ should have taken into account that (i) he was the victim of a break-in at age 13 or 14; (ii) he received only limited secondary education, and (iii) he was allegedly abused by his mother. But none of these factors has any logical connection to whether it was reasonable for Petitioner to fear persecution in Indonesia on the basis of his ethnicity. Accordingly, we reject this argument.

## III. CONCLUSION

We REVERSE and REMAND to the BIA for further proceedings in accordance with this decision.